IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HEIDI SUE DILLENBACH,

                        Plaintiff,

      v.

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                       Defendant.

CV 05-1949-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff Heidi Sue Dillenbach ("Dillenbach") brings this action for judicial review of a
final decision of the Commissioner[1] of the Social Security Administration denying her
application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")
disability benefits under Titles II and XVI of the Social Security Act ("SSA"). The court has

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. He is substituted as the
defendant in this action pursuant to FRCP 25(d)(1) and 20 USC § 405(g).

jurisdiction under 42 USC §§ 405(g) and 1383(c).  The Commissioner's decision should be reversed and remanded for an award of benefits.

## BACKGROUND

Born in 1948,[2] Dillenbach earned a high school education and completed one year of college.  Tr. 83, 95.[3]  Dillenbach's birth name of Thomas V. Bailey was changed in 2001. Tr.  86, 88.  While anatomically a male who presented herself as male until December 1999, Dillenbach now "lives and dresses [herself] as if [she] were a woman."  Tr. 122.  Prior to 1996, she held jobs as a commercial carpenter, metal shop laborer, apartment painter, and maintenance worker.  Tr. 90.

Dillbenbach alleges she has been disabled continuously since April 30, 1996, based on post traumatic stress disorder ("PTSD"), dissociative identity disorder, gender identity disorder, depression, and anxiety disorder with panic attacks.  Tr. 89.  A claimant seeking DIB must show that the disability commenced during a period in which she had "insured status" under the program.  42 USC § 416(i)(3).  Dillenbach's last insured date is June 30, 2000.  Tr. 20, 383.

After being denied DIB on July 17, 1974 (Tr. 104), she applied for DIB and SSI on September 22, 2000.  Tr. 83-85, 368.  When her application was denied initially and on reconsideration, she requested a hearing.  Tr. 57-67, 369-73.  On February 4, 2002, after a hearing held on January 8, 2002 (Tr. 27-56), the Administrative Law Judge ("ALJ") issued a decision unfavorable to Dillenbach.  Tr. 16-26.  That decision was appealed to the Appeals Council which denied Dillenbach's request for review on January 28, 2003.  Tr. 6-7.  Dillenbach

---

[2]  In accordance with Local Rule 10.3(a)(3), only the relevant year is given.

[3]  Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer (docket # 5).

then appealed that decision to this court which remanded the case back to the ALJ based on a stipulation of the parties.  Tr. 393-95.  On remand, the same ALJ held a hearing on July 25, 2005, and a supplemental hearing on August 22, 2005.  Tr. 807-85.  On October 28, 2005, the ALJ again denied Dillenbach's claim.  Tr. 381-90.  Because no exceptions were filed and the Appeals Council did not otherwise assume jurisdiction, the decision of the ALJ became the final decision of the Commissioner after remand.  20 CFR §§ 404.984 & 416.1484.  Pursuant to 42 USC § 405(g), Dillenbach requests judicial review of the Commissioner's final administrative decision.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of no less than 12 months[.]"  42 USC § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996) (citations omitted). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 CFR §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999):

At step one, the Commissioner determines whether the claimant is engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, then the Commissioner proceeds to step two.  20 CFR §§ 404.1520(b), 416.920(b).

3 - FINDINGS AND RECOMMENDATION

At step two, the Commissioner determines whether the claimant has one or more severe impairments.  If not, the claimant is not disabled.  If the claimant has a severe impairment, then the Commissioner proceeds to step three.  20 CFR §§ 404.1520(c), 416.920(c).

At step three, the Commissioner determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 CFR Part 404, Subpart P, Appendix 1 ("Listing of Impairments").  If so, the claimant is disabled.  If the impairment does not meet or equal one of the listed impairments, then the Commissioner proceeds to step four. 20 CFR §§ 404.1520(d), 416.920(d).

If the adjudication proceeds beyond step three, the Commissioner must determine the claimant's residual functional capacity ("RFC").  The RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by the impairments.  20 CFR §§ 404.1545(a), 416.920(e), 416.945; Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the Commissioner determines whether the claimant is able to perform work he or she has done in the past.  If so, the claimant is not disabled.  If the claimant demonstrates that he or she cannot perform work done in the past, the Commissioner proceeds to step five. 20 CFR §§ 404.1520(e), 416.920(e).

Finally, at step five, the Commissioner determines whether the claimant is able to do any other work.  If not, the claimant is disabled.  If the Commissioner finds the claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines,

20 CFR Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates a significant

number of jobs exist in the national economy that the claimant can do, then the claimant is not

disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 CFR

§§ 404.1520(f), 404.1566, 416.920(f).

At steps one through four, the burden of proof is on the claimant.  *Tackett*, 180 F3d at

1098.  However, at step five, the burden shifts to the Commissioner to show that the claimant

can perform jobs that exist in significant numbers in the national economy.  *Id.*

## THE ALJ's FINDINGS

At step one, the ALJ found that Dillenbach has not engaged in substantial gainful activity

since April 30, 1996.  Tr. 383.

At step two, the ALJ determined that Dillenbach suffers from the following severe

impairments: personality disorder with borderline and schizoid features, history of depression in

remission, polysubstance abuse in remission, gender identity disorder, history of colitis and a

history hepatitis C that is non-symptomatic.  Tr. 384.  A history of post-traumatic stress disorder,

which Dillanbach denied at the 2002 hearing, was considered non-severe.  *Id.*

The ALJ decided that Dillenbach's physical impairments limit her to medium exertion

and that her mental impairments "cause her to be unable to work as part of a team, to occasional

public contact and works best alone."  Tr. 386.[4]

At step four, the ALJ found that Dillenbach cannot perform her past relevant work.

Tr. 389.  At step five, the ALJ concluded that Dillenbach could perform the jobs of housekeeper,

---

[4] This RFC was the same as in the ALJ's prior decision, with the added limitation of medium work.  Tr. 24.

5 - FINDINGS AND RECOMMENDATION

janitor, and small products assembler.  *Id*.  As a result, he found her not to be entitled to DIB or SSI.  *Id*.

## **STANDARD OF REVIEW**

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986) (citations omitted).  If supported by substantial evidence, the Commissioner's decision must be upheld if it supported by substantial evidence, even though the evidence is susceptible to more than one rational interpretation.  *Andrews*, 53 F3d at 1039-40; *Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001) (citation omitted) ("the court may not substitute its judgment for that of the Commissioner").

## **DISCUSSION**

Dillenbach challenges the RFC assessment by contending that the ALJ ignored the totality of the evidence that she could not sustain a full-time job and by rejecting her complaints without clear and convincing reasons supported by evidence in the record.  This court concludes that the totality of the evidence requires a remand for an award of benefits.

///

///

## I.    <u>Whether the ALJ Ignored the Totality of the Evidence</u>

Dillenbach contends that the ALJ erred by:  (1) ignoring evidence that she cannot sustain a full-time job because she is overly sensitive to criticism, perceives slights, is easily hurt by others, and decompensates when exposed to such interactions common in the workplace; and (2) relying solely on the non-examining physician's opinion to reject the opinions and findings of all other medical providers.

At issue is medical and lay opinion evidence ranging from 1994 to 2005, including the opinions of one examining psychiatrist (Dr. David J. Heck), three examining psychologists (Drs. James M. Wahl, Ann B. Clarkson, and Marc Stuckey), and lay witness evidence from three sources:  therapists Cheryl Jardine and Linda Vick and State of Oregon vocational counselor Lori Mashek.

### A.    <u>Legal Standard</u>

The ALJ is responsible for resolving conflicts and ambiguities in medical evidence.  *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1195 (9th Cir 1999) (citation omitted). Courts in the Ninth Circuit distinguish among the opinions of three types of physicians:  (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians).  *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995).  Generally, a treating physician's opinion is afforded the greatest weight in disability cases because "the treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual."  *Ramirez v. Shalala*, 8 F3d 1449, 1453 (9th Cir 1993) (citations and internal quote marks omitted).  The opinion of an examining physician is, in turn, entitled to greater weight

than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F2d 502, 506 n4 (9th Cir 1990). A treating physician's opinion on the nature and severity of the claimant's impairment is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent" with other substantial evidence in the record. 20 CFR § 404.1527(d)(2). However, a treating doctor's uncontroverted opinion on issues that are reserved to the Commissioner is neither controlling nor given any special significance. 20 CFR § 404.1527(e); *see also* SSR 96-5p, 1996 WL 374183 (July 2, 1996). Whether an individual is "disabled" under the SSA is an issue reserved to the Commissioner. SSR 96-5p.

An uncontradicted treating or examining doctor's opinion may only be discredited for "clear and convincing reasons." *Thomas v. Barnhart*, 278 F3d 947, 957 (9th Cir 2002) (citation omitted). If it is contradicted by the opinion of another doctor, the ALJ may reject the treating or examining doctor's opinion by providing "specific and legitimate reasons" supported by substantial evidence in the record. *Lester*, 81 F3d at 830 (citation omitted).

Testimony from a non-examining expert ordinarily does not warrant rejection of a treating physician's opinion. *Id* at 830-31; *Pitzer*, 908 F2d at 506 n4 ("The non-examining physicians' conclusion, with nothing more, does not constitute substantial evidence, particularly in view of the conflicting observations, opinions, and conclusions of an examining physician"). In other words, the ALJ may reject the testimony of an examining physician in favor of a non-examining physician only by giving specific, legitimate reasons supported by substantial evidence in the record. *Robert*, 66 F3d at 184.

Only "acceptable medical sources" can give medical opinions to establish the existence of a medically determinable impairment.  20 CFR §§ 404.1513(a) & 416.913(a), 404.1527(a)(2) & 416.927(a)(2).  "Acceptable medical sources" include licensed physicians and licensed psychologists, but not licensed clinical social workers and therapists.  20 CFR §§ 404.1513 & 416.913.

Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless the ALJ expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.  *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996) (citation omitted).  A lay witness cannot establish a medical diagnosis, but may testify regarding a claimant's symptoms and activities of daily living.  *Id.*

**B.    Analysis**

Dillenbach contends that the ALJ ignored evidence which consistently supported the position that she is overly sensitive to criticism, perceives slights, is easily hurt by others, and decompensates when exposed to such interactions common in the work place.

**1.    Dr. Heck**

Dr. Heck examined Dillenbach on July 17, 1995 (Tr. 175-93), and completed a second report on August 2, 1995, upon receipt of additional records (Tr. 172-74).  Dillenbach was administered the Minnesota Multiphasic Personality Inventory -2 ("MMPI-2"); the F-K scale dissimilation score was -13, which was consistent with a valid MMPI-2 profile.  Tr. 189. Dr. Heck found Dillenbach to be "extremely sensitive to reexperiencing the victim role," "prone to overreacting and/or misperceiving situations involving other people," "not assertive" "keep[ing] anger bottled up," and "avoiding confrontation for fear of being rejected or hurt."  Tr.

172, 189, 192. "Criticism causes [her] considerable tension, especially if conveyed by persons in authority." Tr. 190. He rendered Axis I diagnoses of adjustment disorder with anxiety and depressed mood in remission and polysubstance dependence in remission, as well as an Axis II diagnosis of personality disorder not otherwise specified with dependent and obsessive/compulsive traits. Tr. 172, 190. He did not recommend any psychiatric treatment and considered Dillenbach to be "medically stationary and capable of working in [her] former capacity." Tr. 193.

The ALJ did not discuss Dr. Heck's findings. While ignoring evidence is normally equivalent to rejecting it, *Smolen v. Chater*, 80 F3d 1273, 1286 (9th Cir 1996), Dr. Heck's conclusions actually support the ALJ's determination. However, his examination took place years before Dillenbach's gender change.

### 2.    Dr. Wahl

Dr. Wahl examined Dillenbach on October 11, 2000. Tr. 258-73. Dillenbach represented having at least three separate personalities: Thomas was the "cultural overlay personality," but had gotten tired of all the pressure and had became less and less functional; Heidi Sue was a protector personality who knew how to cope, but had to be hidden; other personalities, including Timmy, "a sad little boy," were less prevalent. Tr. 258. After performing a WAIS-III test, Dr. Wahl concluded that Dillenbach had a High Average range of intellectual functioning at the 88th percentile. Tr. 261. Her results on organicity testing were within normal limits and indicated "very good attention, concentration and pace." *Id*. Dr. Wahl also administered a valid MMPI-2 profile which was "entirely consistent with [Dillenbach's] presentation and self-report." Tr. 262. People with this profile are "odd, peculiar and marginal

individuals who are impulsive and unpredictable in behavior," often experience "[i]ntense family conflicts and early problems in self-identification," sometimes fail "to integrate various aspects of identity" and develop an "attitude of distrust at a very early age" and inability to handle "feelings of dissatisfaction and anger in an appropriate manner." *Id*.

Dr. Wahl diagnosed Dillenbach with dissociative personality disorder, gender identity disorder, alcohol dependence, and amphetamine dependence in early full remission, and assigned her a global assessment of functioning ("GAF")[5] score of 50.[6] *Id*. Dr. Wahl believed Dillenbach's limitations would be indefinite "even with complete sobriety and outpatient treatment" and that the only restriction on her daily living activities concerned her admitted difficulty in managing funds. Tr. 263.

Dr. Wahl concluded that Dillenbach would have a great deal of difficulty performing her prior work activity or any job that required her to function as her front personality (Thomas). *Id*. As to whether Dillenbach could perform work most suitable to her current prominent personality (Heidi Sue), Dr. Wahl opined that the answer "is not as straightforward." *Id*. Although she has "superior verbal skills and could learn a variety of jobs with ease . . . [g]iven her presentation and unusual symptoms the social atmosphere of these jobs would have to be, shall we say, *forgiving*, but in more metropolitan areas such situations are not unheard of." *Id* (emphasis in original).

___

[5] American Psychiatric Ass'n., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th Ed. 2000) ("DSM IV"), p. 34. The GAF score describes an individual's psychological, social, and occupational functioning, using a single measure based on symptoms of mental impairments, as well as life stressors and physical impairments. *Id* at 32-34. It is a tool for "reporting the clinician's judgment of the individual's overall level of functioning." *Id* at 32.

[6] GAF scores between 41 and 50 indicate "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning *(e.g.*, no friends, unable to keep a job)." DSM IV, p. 32.

In a check-the-box form completed the same day, Dr. Wahl opined that Dillenbach was markedly[7] limited in her social functioning, particularly in her ability to interact appropriately with the general public and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and moderately limited in the ability to work in coordination with or proximity to others without being distracted by them and to respond appropriately to criticism from supervisors.  Tr. 270, 273.  She had no significant limitations in her concentration, persistence and pace.  Tr. 270, 272-73.  However, he anticipated that Dillenbach would "often" experience episodes of deterioration in work and work-like settings, which was "more likely if forced to pursue prior work activity."  Tr. 271.

The ALJ assigned "little weight" to Dr. Wahl's GAF score of 50 because he believed "there is simply no objective evidence to support such a GAF score."  Tr. 388.  The ALJ also rejected the validity of the MMPI-2 profile because "subsequent MMPI-2 profiles [administered by Drs. Clarkson and Stuckey] revealed that [Dillenbach] was 'faking bad' and because Dillenbach had stated "that she wanted back disability benefits to pay for her sex change operation."  Id.  Lastly, the ALJ rejected Dr. Wahl's opinion because Dillenbach's activities of "watching TV, drinking beer with her friends," her "hobbies of gem collection, playing guitar, and sailing," and her ability "to take care of her personal needs, cook, shop, and perform routine cleaning tasks . . . are not reflective of one who has serious/severe limitations as indicated by Dr. Wahl's assessed [GAF] score."  Id.

As discussed below, the ALJ erroneously concluded that the later MMPI-2 profiles by Drs. Clarkson and Stuckey were invalid.  But even if those later MMPI-2 profiles were invalid,

---

[7]  "Marked" is a standard for measuring the degree of limitation that is more than moderate but less than extreme. 20 CFR Pt. 404, Subpt. P, App. 1, 12.00.C.

there is no evidence that Dillenbach misrepresented herself in this particular MMPI-2 test.  In fact, even Larry Hart, Ph.D., a clinical psychologist who testified at the hearing, explained that three different MMPI-2s could legitimately be interpreted differently because the MMPI-2 measures not just long-term factors ("trait factors") but also mental state current factors which can change.  Tr. 855.  If Dr. Wahl's findings on the MMPI-2 profile are accepted, then the individuals with Dillenbach's MMPI-2 profile are impulsive and unpredictable, have intense family conflicts and early problems in self-identification, are unable to handle feelings of dissatisfaction and anger in an appropriate manner and sometimes fail to integrate various aspects of identity.  Tr. 262.

Furthermore, the ALJ's rejection of the valid MMPI-2 on the basis of secondary gain is not a specific and legitimate reason.  It is true that Dillenbach stated she wanted disability benefits to pay for her sex change operation (Tr. 784) and, as Dr. Hart testified, secondary gain is a factor that can be considered in interpreting an elevated F scale.  Tr. 857-59.  However, as Dr. Hart also admitted, money is a factor in all MMPI-2s administered to applicants for social security benefits.  Tr. 864.  Dillenbach's financial need due to years of not working is not uncommon among social security applicants.  Legitimizing the ALJ's reason would insert the issue of secondary gain into every social security application where the applicant has a financial need.  Moreover, there is evidence in the record that, while Dillenbach certainly desires a sex change operation, it is not essential to her identity as a woman.  Tr. 804.

The ALJ's rejection of Dr. Wahl's assignment of a GAF score of 50 on the basis of perceived inconsistencies with Dillenbach's daily living activities is not supported by substantial evidence in the record.  Dr. Wahl concluded that Dillenbach's limitations do not restrict her daily living activities, except with administering money.  Most of the daily activities named by the

ALJ (watching TV, taking care of her personal needs, cooking, and performing routine cleaning) present no social stressors.  Other activities named by the ALJ, such as gem collecting, guitar playing and sailing, are ones Dillenbach no longer pursues.  As early as October 2000, she listed them as activities she used to pursue before her condition began, but no longer did. Tr. 120.  Still others, such as shopping, have been adjusted by Dillenbach to be "safe" by going through certain checkouts when certain cashiers she felt comfortable with were working.  Tr. 37.  None of the daily activities relied upon by the ALJ address the critical issue whether Dillenbach can perform full-time work without decompensating.

The record contains other evidence of social contact (AA and CA meetings, meetings with therapy groups and counselors, job training and job counseling), but also is peppered with accounts of Dillenbach's anger, passive aggressiveness and open confrontation with the people she came into contact with, be it therapists, vocational counselors or AA or CA group members. *E.g.*, Tr. 189, 356, 694, 740-41, 501, 502, 493, 721, 816-19.

Dr. Wahl concluded that Dillenbach had marked and moderate limitations in social functioning.  Such limitations are consistent with a GAF score of 50, which indicates serious symptoms or serious impairment in social, occupational, or school functioning.  Thus, the ALJ erred by rejecting Dr. Wahl's GAF score.

On the other hand, it is somewhat puzzling that Dr. Wahl checked a box that Dillenbach was "not significantly limited" in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms."  Tr. 273.  At the same time, he also stated that Dillenbach would "often" experience episodes of deterioration at work, "more likely if forced to pursue prior work activity."  Tr. 271.  Attempting to reconcile these two statements, it appears that while Dillenbach would experience episodes of deterioration at work

14 - FINDINGS AND RECOMMENDATION

and has some marked limitations, Dr. Wahl did not deem them significant enough to prevent completion of a normal work week without interruptions.  More illuminating is Dr. Wahl's conclusion that while Dillenbach would have a great deal of difficulty performing any job that required her to function as "Thomas," she was a quick learner and could perform work as "Heidi" in jobs where the social atmosphere was more forgiving of her presentation and unusual symptoms.

### 3.    Dr. Clarkson

Dr. Clarkson examined Dillenbach on June 24 and July 1, 2002.  Tr. 665-76.  Upon administering the MMPI-2, Dr. Clarkson opined that Dillenbach "overreported pscyhopathology" by endorsing items at all levels of severity.  Tr. 673, 675.  She referenced a study examining the behavior of hospital patients with MMPI-2 raw scores similar to Dillenbach's, who, in stark contrast to her above average verbal IQ, were "unable to understand proverbs, were monosyllabic, had delusions of reference, had auditory hallucinations, were disoriented for space, had short attention span, and did not know why they were hospitalized." Tr. 673.  Dr. Clarkson concluded that she was unable to interpret the MMPI-2 any further, determining that before "this or another MMPI-2 could be interpreted," Dillenbach's definitions of "self" and "other" would need to be known.  Tr. 673, 675.  Furthermore, she cautioned that because "there are no standardization groups for those in the process of changing their gender . . . interpreting her MMPI-2 might be difficult.  Corroborative evidence regarding Ms. Dillenbach's behavior would be very helpful."  Tr. 673.

Dr. Clarkson diagnosed Axis I dissociative identity disorder, gender identity disorder (in transition) and polysubstance dependence in full remission.  Tr. 676.  She recommended that

Dillenbach continue "to have medical, financial, and psychotherapeutic assistance," but also assessed a GAF score of 61. *Id*.

The ALJ did not specifically assign weight to Dr. Clarkson's opinion, but, in the context of rejecting Dr. Stuckey's opinion, cited with approval her conclusion that Dillenbach's MMPI-2 profile was invalid. Tr. 388. However, the ALJ's approval of an invalid MMPI-2 is not supported by the rest of Dr. Clarkson's report. The ALJ failed to acknowledge Dr. Clarkson's cautions about interpreting the MMPI-2. Rather than completely ruling out Dillenbach's alleged symptoms, Dr. Clarkson thought corroborative evidence of her behavior would be very helpful. Thus, the ALJ erred by interpreting this MMPI-2 profile as invalid.

However, Dr. Clarkson's opinion on Dillenbach's level of functioning is accurately reflected in the ALJ's RFC. A GAF score of 61 means some difficulty in social, occupational or school functioning, but people with this GAF "generally function pretty well." DSM IV, p. 32. This is well within the limitations acknowledged in the RFC.

### 4.    **Dr. Stuckey**

Dr. Stuckey conducted a pscyhodiagnostic interview, mental status exam and personality assessment of Dillenbach on March 25, 2005. Tr. 541-49. Dr. Stuckey found that Dillenbach did not present with significant cognitive impairment, her intellectual capacity appeared average or above, and she was capable of managing funds. Tr. 545.

On the MMPI-2 test, Dillenbach had a severely-elevated F-scale. Dr. Stuckey viewed those results as a:

> cry for help out of distress and thusly an over-distortion of his symptomatology to manipulate the data in order to create a negative impression. In this way, [her] responses are seen as paralleling [her] propensity to exaggerate [her] life circumstances and vacillate between neuroses and personality conflicts particularly given [her] low ego

> strength to handle [her] emotional responses.  Along these lines, Ms.
> Dillenbach is seen as struggling with schizoid and borderline features and
> to engage in characterological, manipulative strategies in which sub-
> personalities (through disassociation) are also manifest.

Tr. 544.

Dr. Stuckey concluded that "when [Dillenbach] becomes overwhelmed or pressured into dealing with previous trauma or emotional issues to which [she] does not feel prepared, then [she] is apt to dissociate and other sub-personalities can manifest." *Id*.  He also noted that Dillenbach's "propensity to disassociate was also exhibited in [her] MMPI-2 and in addition [she] presents with both borderline and schizoid features."  *Id*.

Dr. Stuckey diagnosed Dillenbach with Axis I dissociative identity disorder, gender identity disorder, panic disorder with agoraphobia, major depressive disorder (recurrent, moderate), alcohol, amphetamine, cannabis and opiate dependence in sustained full remission, as well as Axis II borderline and schizoid features.  *Id*.

In a check-the-box form completed the same day, Dr. Stuckey concluded that in a work setting, based on her history of disassociating when overwhelmed, Dillenbach suffers from marked restrictions in responding appropriately to work pressures and to changes in a routine, and moderate restrictions in interacting appropriately with the public, supervisors and co-workers.  Tr. 548.  On the other hand, Dillenbach has no limitations in understanding, remembering and carrying out instructions.  Tr. 547.

The ALJ gave "little weight" to Dr. Stuckey's assessment of marked limitations, finding it was "not supported by his own evaluation or by the objective testing he administered."  Tr. 388.  As an example, the ALJ referred to "an invalid MMPI-2 profile as evidenced by

[Dillenbach's] severely elevated F-scales," pointing once again to Dr. Hart's testimony that "this was indicative of 'faking bad'" and Dr. Clarkson's invalid MMPI-2 profile.  *Id*.

The ALJ mischaracterized Dr. Hart's testimony in order to reject Dr. Stuckey's opinion. Dr. Hart did not testify that a "cry for help" is *outdated* medical terminology, only that the term is "*old* clinical actuarial language, which came out of the 1950s.  And you see it repeated over and over again."  Tr. 854 (emphasis added).  Although Dr. Hart speculated that Dr. Stuckey's wording evidenced his belief that the MMPI-2 was "fake looking," in fact Dr. Stuckey found that Dillenbach's responses to the MMPI-2 were consistent with her limitations.  Even Dr. Hart admitted that one can get an elevated F scale "for many other reasons, including for severe personality problems."  Tr. 859.  Therefore, this ground for rejecting Dr. Stuckey's opinion is not supported by substantial evidence.

The ALJ also relied on Dr. Clarkson's interpretation of the MMPI-2 as invalid given her over-reported pscyhopathology.  While this is a specific reason, it fails to be legitimate because it omits Dr. Clarkson's concern that the MMPI-2 test was not designed to account for people in the process of changing their gender, as well as her cautions about interpreting *any* MMPI-2 test.

In summary, the ALJ failed to offer specific and legitimate reasons supported by substantial evidence for rejecting Dr. Stuckey's opinion.

### 5.    Lay Witnesses

#### a.    Jardine

Jardine became Dillenbach's counselor on January 28, 2002 (Tr. 539), and saw her for over 60 individual sessions until June 25, 2003 (Tr. 734).  On May 9, 2002, based on 12 individual counseling sessions, Jardine wrote a letter to the SSA in support of Dillenbach's application for benefits and assessed a GAF score of 45.  Tr. 539-40.  In those sessions, Jardine

18 - FINDINGS AND RECOMMENDATION

noted Dillenbach's feelings of anxiety, depression and loneliness, people's negative reactions to her identity as a woman, and her financial stress at being denied social security benefits and learning that she would only be on general assistance for another year and a half.  Tr. 783-95.  In the last month of counseling, she assigned Dillenbach GAF scores of 45 to 50.  Tr. 734-38.

The ALJ accorded "little weight" to Jardine's assessments because:  (1) they were "based exclusively on [Dillenbach's] subjective complaints, which have been drawn into question given her two invalid MMPI-2 profiles suggesting 'faking bad' and the secondary gain issues as noted by the medical expert;" (2) failure to provide any treatment records to support her conclusions; (3) failure to "identify any specific functions or activities that [Dillenbach] is unable to perform on a sustained basis to support her conclusions;" and (4) failure to have Dillenbach "undergo any objective psychological or psychiatric testing to substantiate any of [her] subjective allegations."  Tr. 388-89.

As discussed above, two of these reasons are not legitimate.  The ALJ's conclusion that the MMPI-2s were indicative of "faking bad" is not supported by substantial evidence, and the ALJ's the rejection of Dillenbach's allegations based on secondary gain is improper.

The ALJ's finding that Jardine failed to provide treatment records to support her conclusions is not supported by substantial evidence.  The record contains Jardine's treatment notes from more than 60 individual counseling sessions with Dillenbach.

Also contrary to the ALJ's finding, Jardine did conduct some objective psychological testing, such as the Beck Depression Inventory (Tr. 795), and frequently assessed Dillenbach's GAF score.  Tr. 734-95.  Furthermore, Jardine's role was to offer Dillenbach psychotherapy.  Dr. Hart testified that personality disorders are "primarily treatable by psychotherapy" as offered by Jardine.  Tr. 866-67.

19 - FINDINGS AND RECOMMENDATION

Equally underwhelming is the ALJ's decision to reject Jardine's opinion because she failed to identify any specific functions or activities that Dillenbach was unable to perform on a sustained basis. However, Jardine's regular therapy notes make clear the nature and extent of Dillenbach's difficulties and level of functioning. Furthermore, if the ALJ deemed certain information necessary in order to evaluate Jardine's opinion, then he could have obtained it. The Commissioner bears the burden of developing the record, even when the claimant is represented by counsel. *DeLorme v. Sullivan*, 924 F2d 841, 849 (9th Cir 1991) (citations omitted). This is because "[d]isability hearings are not adversarial in nature." *Id.*

### b.    Vick

Succeeding Jardine, Vick counseled Dillenbach for at least two years starting on July 2, 2003. Tr. 677-733. Vick's notes include discussions about Dillenbach's identity as a woman (Tr. 726, 729), her attempts to reach out to her family (Tr. 717, 719-20, 724-27, 730, 732), her "split personality" and comfort with her sense of integration following her gender change (Tr. 724), feeling sad, withdrawn, and fearful at times (Tr. 725, 729-30), doing well other times (Tr. 716-17, 726-27), finishing a novel and finding an editor for it (Tr. 716).

On August 17, 2005, Vick wrote a letter in support of Dillenbach's efforts to receive social security benefits. Tr. 804-05. She believed that Dillenbach's mental health symptoms were "sufficiently debilitating to warrant designation as disabling." Tr. 804. While Dillenbach had "largely been successful in making the gender transition from male to female" and ideally would have surgery to complete her transition, "it is not essential to her central identity as a woman." *Id*. However, she opined that Dillenbach continued to suffer from:

> periods of depression, anxiety and frequent and often debilitating flashbacks, obsessive negative rumination, self-criticism and dissociative episodes.  She has difficulty tolerating stress and intense emotions, and tends to become easily overwhelmed when faced with complex problem solving, time pressure or less than helpful people.  When overwhelmed, she tends to dissociate and numb out, making it difficult to remember what happened and to follow directions.  She has demonstrated in therapy sessions a tendency to be hyper-vigilant and defensive if she interprets inattention, judgment or criticism.  She demonstrates impatience, tends to jump to negative conclusions about people's intentions and assumes that people would hurt her given a chance.  This has led to significant social isolation and withdrawal from most interpersonal interactions, except for AA meetings and a few hours of volunteer work.  It is my belief that, while Ms. Dillenbach has made some progress, at this time her mental health symptoms and interpersonal problems would make it difficult for her to be successful in a normal work environment."

Tr. 804-05.

The ALJ accorded Vick's opinion "some weight as the totality of the records does indicate [Dillenbach] does have problems in working in a normal work environment."  Tr. 389. That finding is supported by the record.  In her August 17, 2005 letter, Vick discussed Dillenbach's functional limitations.  Although Vick concluded that Dillenbach's mental health problems were sufficiently debilitating to find her disabled, findings of disability are issues reserved to the Commissioner.  Moreover, Vick's opinion on disability is contradicted by her own GAF assessments during the two years preceding her letter, ranging from a low of 52 to a high of 68 (Tr. 677-733), which is a range inconsistent with impairments supporting a disability.

### c.    Mashek

Mashek, a vocational rehabilitation counselor for the State of Oregon's Vocational Rehabilitation Division, attempts to get people back to work by determining whether there is medical evidence of a disability, and if so, how that disability interferes with the client's ability to obtain or maintain employment.  Tr. 814.  She worked with Dillenbach for over two years between March 2003 (Tr. 524) and July 2005 (Tr. 432).  Mashek directed her efforts towards

21 - FINDINGS AND RECOMMENDATION

placing Dillenbach in a work environment where she could feel safe in order to help her maintain

employment, and determined she may need training to reenter the job market as a female.

Tr. 524.  Based on Dillenbach's medical records, Mashek determined that her impediments to

employment included conflict with coworkers, inappropriate response to others, isolation/

withdrawal of coworkers, negative work history, unacceptable interactions at work, poor

decision making, and short attention span.  Tr. 523.

On July 14, 2005, Mashek filled out a disability determination noting that Dillenbach

suffered from histrionic and borderline personality disorder, had numerous functional

limitations, including:

> poor interpersonal skills, unrealistic expectations, intense mood swings,
> needs to be the center of attention, can be inappropriate in sexual behavior
> or presentation of self, dramatization, theatrical, exaggerated expression,
> unstable intense relationships, extremes of idealization and devaluation,
> unstable self image, impulsivity, lacks insight and awareness, easily
> angered and frustrated, demanding.  Has great difficulty getting along with
> employers and coworkers.  Is unable to maintain a professional attitude
> and behave appropriately in work settings.  Difficulty being redirected or
> having work critiqued.  Unreliable and dependable when moods are
> fluctuating.

Tr. 432.

At the July 25, 2005 administrative hearing, Mashek testified that it was very important

to Dillenbach to work in an office setting.  Tr. 815-16.  As Mashek had observed Dillenbach to

be abrupt, demanding and rude, she knew that she would be unable to work at the front desk of

an office and focused her efforts on obtaining employment in the medical records field.  Tr. 816.

Mashek revealed several incidents where Dillenbach behaved inappropriately towards her,

instructors and classmates at Computer Skills Plus where she was undergoing training, and the

job developer who was helping her with her interpersonal skills and her presentation, how to act

22 - FINDINGS AND RECOMMENDATION

professionally on the job.  Tr. 816-19.  All efforts to secure a job for Dillenbach were

unsuccessful despite her high motivation because her anxiety on the job made it difficult for her

to perform and, even with a lot of hand-holding, she was not able to perform at a true

competitive level.  Tr. 819-20.  Mashek further testified that while Dillenbach had success in

completing training, passing certification, and feeling more optimistic about the future, she starts

to decompensate when she is working with a superior who is not very understanding or

supportive, when she perceives that somebody does not like her, or when multiple things are

going on at the same time and she is required to multi-task.  Tr. 830-31.

      In Mashek's opinion, if Dillenbach were placed in a job where she would have minimal

contact with supervisors, coworkers and the public, as well as a very simple, repetitive kind of

job with no multi-tasking, she would "perform okay for a little bit of time," but if she was

required to work for 20 to 40 hours a week, "then once she has to start performing it more and

more hours, she decompensates more."  Tr. 831.  Mashek said that her office had exhausted all

the services they could offer Dillenbach and that none of the 12 vocational counselors could

come up with anything else to do for her.  Tr. 832.  She also testified that she had actually seen

Dillenbach's meltdowns, when she could be very demanding, cry, yell, become very difficult,

more like a male aggressor.  Tr. 821.

      After the hearing, Mashek wrote a letter dated August 24, 2005, regarding Dillenbach's

functional limitations, stating:

> Functional limitations on a worksite would include mood swings,
> impulsivity, unpredictable behavior, difficulty handling anger
> appropriately, poor interpersonal skills, short attention span, memory
> impairment, easily overwhelmed, unstable intense relationships, extremes
> of idealization and devaluation, unstable self-image and inner conflict,
> lacks insight and awareness, difficulty with feedback, isolation, rejection,
> high anxiety, inability to conform and has a decrease in work productivity

> when symptoms are increased.  I want to go on to say that her ability to
> work in a male dominated field is severely impacted by her disability
> issues and by her employer and coworkers.  She is not accepted in a
> female dominated environment as well.  [Dillenbach] is caught in an in-
> between world.  Even if she did not have Gender Identity Disorder, her
> multiple mental health diagnoses interfere with her ability to be successful
> on any job.

Tr. 806.

She concluded that, in her professional opinion, Dillenbach was "non-competitive and

should receive" social security disability payments.  *Id*.

The ALJ rejected Mashek's opinion that Dillenbach was unemployable because:  (1) she

focused her effort on placing Dillenbach in a "female" dominant position, *i.e.* office work; (2) it

was based on nothing more than her personal view that Dillenbach was unemployable because

she was a transsexual; (3) it was not supported by the totality of the records, which indicated that

Dillenbach was exaggerating her symptoms and/or limitations as evidenced by the two invalid

MMPI-2 profiles and her need for money; (4) Mashek noted that Dillenbach has the skills and

ability to work independently; (5) Dillenbach reported that life was good (December 2004 and

February 2005), that she loved people and problem solving (July 2004), that she was ridiculously

healthy and happy for her situation in life, wanted to work and nothing was wrong in her life that

a couple of paychecks could not solve (December 2003); and (6) Computer Skills, Inc. noted that

Dillenbach was one of their most accomplished students and wished all their students were as

easy to work with.

This court has already rejected the notion that because two of the MMPI-2 profiles were

invalid, Dillenbach exaggerated her symptoms.  Also, this court has rejected the notion of

secondary gain based on Dillenbach's wish to use back pay to finance sex surgery.

24 - FINDINGS AND RECOMMENDATION

Dillenbach indeed made optimistic comments to Mashek that life was good, she loved people and problem solving, was ridiculously healthy and happy for her situation in life (Tr. 460), wanted to work and nothing was wrong in her life that a couple of paychecks could not solve (Tr. 479). However, the truth of these statements does not necessarily support the conclusion that Dillenbach was fit to work. The record includes a plethora of Dillenbach's statements reflecting her variable moods, ranging from elation to deep depression to sadness. This rollercoaster of emotions is consistent with Dillenbach's diagnoses and her fragile sense of self.

The ALJ's rejection of Mashek's opinion because it simply reflected her personal view that Dillenbach was unemployable because she was a transsexual also is not supported by substantial evidence. The ALJ offered no statements by Mashek to support this assertion, and this court has discovered none. In fact, Mashek concluded that even if Dillenbach did not have a gender identity disorder, her multiple mental health diagnoses would still interfere with her ability to be successful on any job. Tr. 806. While the ALJ is not required to accept conclusions on the ultimate issue of disability, this statement is sufficient proof that Mashek did not find Dillenbach unemployable simply because of her gender change.

The Computer Skills, Inc. letter praising Dillenbach as easy to work with and one of its most accomplished students was written in June 2003, the first month of her computer training. The ALJ's selective citations omitted that Mashek and the staff at Computer Skills, Inc., later complained that Dillenbach had made borderline comments which made an instructor uncomfortable (July 2003, Tr. 501), used school computers to access pornography websites (Tr. 501, 818), and rubbed her classmates the wrong way on occasion (September 2003, Tr. 493).

Mashek's notes do reflect a certain improvement in Dillenbach's social and vocational

25 - FINDINGS AND RECOMMENDATION

skills over the two years they worked together.  In May 2005, Mashek noted that Dillenbach "has

the skills and the ability to work independently.  Her personality and appearance I believe are her

biggest barrier."  Tr. 434.  On June 1, 2005, Mashek noted Dillenbach "looked the best I've ever

seen her" and remarked that her "hard work [was] starting to pay off" and she had seen a lot of

personal growth from her since they had begun working together.  Tr. 433.  Mashek also noted

that Dillenbach's mental health symptoms were "stable" and that she was compliant with her

medications.  *Id* ("She notices when she keeps her stress level down her mental health is better

and she is now paying closer attention to it.").

A month and a half later, Mashek's notes differed greatly from her positive June 2005

report.  Asked about the inconsistency between two reports dated so close in time, Mashek

explained that the July 2005 report did not reflect Dillenbach's current functioning, as it was not

a case note, but instead was a disability determination to justify continued funding of vocational

services for her.  However, Mashek did not explain why in May 2005 she found that Dillenbach

had the ability to work independently, despite the barriers of her personality and appearance,

while at the July 2005 hearing she testified that Dillenbach would decompensate the more she

had to work, even in a position where Dillenbach had minimal contact with supervisors,

coworkers and the public, and a simple, repetitive kind of job with no multi-tasking.  This

discrepancy is a cogent reason for rejecting Mashek's opinion.

Equally persuasive is the ALJ's rejection of Mashek's testimony based on her focused

effort to place Dillenbach in a female dominant position.  This court has also pondered why

Mashek's focus was so narrow, why she did not guide Dillenbach into some other vocational

field, whether female-oriented or not, outside of medical office billing/scheduling which clearly

requires some collaboration with coworkers.  It is unclear whether the functional limitations

identified by Mashek in her July 2005 would prevent Dillenbach from performing any job, including jobs where she could work independently, such as a position as a janitor.

Because these latter two reasons given by the ALJ are specific and legitimate, the ALJ did not err by rejecting Mashek's opinion.

## II.    Whether the ALJ Improperly Discredited Dillenbach's Testimony

Dillenbach also contends that the ALJ erroneously discredited her testimony as to the severity of her symptoms.  This court agrees.

### A.    Dillenbach's Testimony

In October 2000, Dillenbach completed a Reconsideration Disability Report, explaining that she lived and dressed "as if [she] were female."  Tr. 122.  In work situations where expected to dress and act masculine, Dillenbach became "confused, uncomfortable, forgetful and nervous.  The other men pick on me more and more as the work goes on.  I try to cover my femininity but it doesn't work.  Period."  *Id*.  Dillenbach wrote that people "get upset sometimes when they notice I'm not a biological female."  *Id*.  She was optimistic she could find a place in the workforce eventually.  *Id*.  She felt always "stuck in somebody else's expectations.  My inside self just gives up, so I don't function very well, like I'm empty inside.  None of the other personalities are functional on a continuing daily basis.  They shift around a lot under pressure, social, personal, financial, emotional."  *Id.*  "Most of my selves prefer to be alone."  Tr. 120.

At the January 8, 2002 hearing, Dillenbach explained that her last full-time job as a maintenance foreman ended in the spring of 1995 and that she did not get along with the other employees there.  Tr. 33-34.  Dillenbach was estranged from her family.  Tr. 36.  While she got along with some people, she had conflicts with others, including at the grocery store, her residence and in counseling.  *Id*.  She left her counseling at DePaul due to tension from such

27 - FINDINGS AND RECOMMENDATION

conflicts.  Tr. 37.  At the grocery store she found cashiers with whom she could get along and

goes shopping during their shifts because she felt "safe" going through their lines, while feeling

"kind of scared" around people she does not know.  Tr. 37.  She was able to take public

transportation as long as she did not make eye contact with anyone, and waited for buses or

trains that were not too full.  Tr. 38.  She did not like being watched and if she felt

uncomfortable in a situation she will leave "no matter what."  Tr. 41.  Dillenbach testified that

even if she worked completely alone, she could not sustain a normal schedule of work because:

> Just in terms of the scheduling, I've got to tell you, I have tried, I have
> tried and tried and tried, and I can't do that, I can sustain it for a certain
> length of time, but then just the routine starts being stressful and, like,
> there will come a day when I can't get dressed, or there will come a day
> when I go out for lunch and I don't come back, or when it just seems
> really, really important to leave at 4:00 and not 5:00, and then it starts
> being a problem, and once it starts being a problem, it feeds itself.

Tr. 42.

At the time of the January 2002 hearing, Dillenbach had been clean and sober for 14

months.  Tr. 39.  She took Zoloft and hormone replacement drugs.  Tr. 39-40.

At the July 25, 2005 hearing, Dillenbach testified that she could not return to any prior

work because she began to lose her "train of thought" and "emotional equilibrium," and the more

"male identified" the job was, the less "emotionally resilient" she became.  Tr. 838.

> So the little things became big things, and normal interpersonal
> relationships became destructive mind fields, where either I would
> completely shut off and not be able to do what I was doing.  Or I would, in
> an effort to either cover that up, or compensate for it I would become
> really like aggressive and unpleasant, and not be able to do things because
> of that.

*Id*.

28 - FINDINGS AND RECOMMENDATION

By that time, she was volunteering two half days a week at two different volunteer jobs at Good Samaritan Hospital, making copies and assembling educational handout materials at the diabetes educational institute, and answering the phone, talking notes, sorting out old medical charts at the cancer care day center and occasionally making appointments for patients.  Tr. 838-39.  She believed that "[a]ll other things being equal," she could probably do these jobs "a lot more than I'm doing.  I don't know about full-time, but close to full-time."  Tr. 839.  However, she pointed out that "all other things aren't equal" because she does not think she could keep a job like that full-time "without blowing up, melting down," although she would like to try.  *Id.* Dillenbach had hoped that the volunteer job at the cancer day care center would turn into a paid position, but realized as soon as she started that "if it was going to turn into a paid position, it would be a long time coming" and that she was "not tasked . . . with high functioned things to do," that the position was "sub-clerical," although she was hoping it would be more than that. Tr. 840.

///

///

B.    **Legal Standard**

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments and show that the impairment or combination of impairments could reasonably be expected to produce some degree of symptom.  *Smolen, Chater*, 80 F3d at 1281-82 (citations omitted).  The claimant is only required to produce objective medical evidence of the impairment, not of the symptom itself, the severity of the symptom or the causal relationship between the impairment and the symptom. *Id* at 1282.  The

29 - FINDINGS AND RECOMMENDATION

claimant is also not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. *Id.*

In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. To determine whether subjective testimony is credible, the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

*Id* at 1284 (citations omitted).

The following factors must also be considered: the circumstances under which the claimant testified, any contradictions or corroborations, the claimant's prior work record, the nature of any symptoms and medical treatment, her daily activities, and any other factors concerning the claimant's functional limitations and restrictions. 20 CFR § 404.1529 and SSR 96-7p, 1996 WL 374186, *3 (July 2, 1996).

If the ALJ finds the claimant's symptom testimony is not credible, the ALJ '"must specifically make findings which support this conclusion" and the findings "must be sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit" it. *Bunnell v. Smolen*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*) (internal quotations and citations omitted). Absent evidence of malingering, the ALJ may reject symptom evidence only by giving clear and convincing reasons, including which testimony is not credible and what facts in the record lead to that conclusion.

*Reddick v. Chater*, 157 F3d 715, 722 (9ᵗʰ Cir 1998) (citation omitted); *Smolen*, 80 F3d at 1281,

1284.  With evidence of malingering, the ALJ must provide "specific, cogent reasons" for his

disbelief.  *Reddick*, 157 F3d at 722 (citation omitted).

  **C.**  <u>**Analysis**</u>

   Dillenbach satisfied the first stage of the analysis by presenting objective medical

evidence of mental illness which could reasonably be expected to produce some degree of the

symptoms she described.  At the second stage of the analysis, the ALJ found that while

Dillenbach's statements are "partially credible to the extent she does have medically

determinable impairments which do cause vocationally relevant limitations, but not to the extent

she is completely disabled by them."  Tr. 386.  Due to the absence of any evidence of

malingering (Tr. 863), the ALJ was required to give clear and convincing reasons to find

Dillenbach not credible.

   The ALJ found that Dillenbach's 1995 conviction for growing cannabis for sale "do[es]

little to bolster [her] credibility."  Tr. 387.  An old conviction for growing cannabis does not

represent a clear and convincing reason for drawing a negative inference on a claimant's

credibility with respect to health symptoms spanning the following decade.

   The ALJ also questioned Dillenbach's credibility based on alleged inconsistencies in her

statements to various medical sources about her consumption of alcohol and marijuana.  The

ALJ perceived inconsistencies between the report by Dillenbach's representative that she had

been clean and sober from alcohol and marijuana since December 2000, her October 2000

statements to Dr. Wahl that she had not used any drugs since May 2000, and a counselor's

September 11, 2001 notes that Dillenbach was "looking for a safe place to drink, not a safe place

for recovery."  Tr. 387.

31 - FINDINGS AND RECOMMENDATION

However, the record does not contain the level of inconsistency perceived by the ALJ. On June 2, 2000, Dillenbach reached out to the Center of Holistic Therapy for help with stopping alcohol and drug use and admitted to therapist Susan Aviotti that she was actively using methamphetamine and alcohol, had last injected and smoked methamphetamine the day before, and had consumed alcohol on the day of the appointment. Tr. 341. By June 7 she was in group therapy and by June 16, her counselor noted that she was a "positive and active group member" who showed "a great desire to remain clean and sober this time." Tr. 339. Unfortunately, Dillenbach experienced a relapse, as Aviotti's September 9, 2000, notes reflect that she was drinking alcohol again (12 beers the day before), and smoking a couple of joints of marijuana per day, but had not relapsed on methamphetamine. Tr. 340. On September 11, 2000 (not 2001 as the ALJ incorrectly noted), the group therapist at the Center of Holistic Health remarked that Dillenbach "appear[ed] to be looking for a safe place to drink not a safe place for recovery" with no plan to quit. Tr. 330. On October 11, 2000, Dr. Wahl noted that Dillenbach used methamphetamine until the end of May 2000" and "denied any drug use since May," but admitted that her alcohol use amounted to 6-12 beers per day every day since August 19, 2000, including one beer consumed at 7:00 a.m. on the day of the examination. Tr. 259.

That Dillenbach quit methamphetamine in early June 2000, rather than at the end of May 2000, is hardly an inconsistency. Nor is her statement that she quit alcohol and marijuana in December 2000 inconsistent with the counselor's statement about her looking for a safe place to use, since that statement was made in September 2000, not in September 2001, as the ALJ thought. The only inconsistency in Dillenbach's testimony is her admission that she smoked marijuana in September 2000 and quit in December 2000, as opposed to her statement to

Dr. Wahl that she had used no drugs since May 2000.  This sole inconsistency does not rise to the clear and convincing level.

The ALJ found that despite Dillenbach's testimony concerning her difficulty "dealing with the public or strangers . . . she had no apparent difficulty going to the local district SSA office to submit apply for disability benefits or appealing and having a hearing of a denial of housing benefits because of a drug conviction."  Tr. 387 (citation omitted).  Describing the HUD appeal, Dillenbach admitted that she felt very successful as long as there was a higher purpose. Tr. 43.  The ALJ interpreted her statement and success in the HUD appeal process to mean that "she is able to do what she needs to do if she believes it is in her self-interest to do so . . . Apparently that does not apply at present to obtaining employment."  Tr. 387.  The ALJ also relied on his personal observations, finding Dillenbach "articulate," "intelligent and focused." *Id*.  As an example of Dillenbach's ability to focus, the ALJ offered her testimony that she was able "to spend time researching gender identification issues on the internet."  *Id*.

The two incidents when Dillenbach exhibited a high level of functioning by applying for social security benefits in person and appealing the HUD decision do not contradict Dillenbach's testimony that she has difficulty working with others and accepting direction.  The same is true of her intelligence and articulate speech.  The ALJ failed to comment on Dillenbach's alleged episodes of dissociation and decompensation, although the medical evidence and notes of her counselors reflect that while she has periods of high functioning, she also decompensates and has a propensity to dissociate in stressful situations.

Accordingly, the ALJ failed to provide clear and convincing reasons to find Dillenbach not credible.

## III.    Remand for Award of Benefits

33 - FINDINGS AND RECOMMENDATION

A.    **Legal Standard**

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000), *cert denied,* 531 US 1038 (2000).  The court's decision turns on the utility of further proceedings.  A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision.  *Rodriguez v. Bowen,* 876 F2d 759, 763 (9th Cir 1989) (citation omitted).

The Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed."  *Harman,* 211 F3d at 1178.  The court should grant an immediate award of benefits when:

> (l)  the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.*

The second and third prongs of the test often merge into a single question:  whether the ALJ would have to award benefits if the case were remanded for further proceedings.  *See id* at 1178 n7.

B.    **VE Testimony**

On August 22, 2005, Vocational Expert ("VE") Gail Vogel testified.  Tr. 871-85.  Dillenbach's past work history includes the jobs of carpenter (medium and skilled), drill press

operator grinder (medium, semi-skilled) and maintenance foreman (heavy, unskilled to semi-skilled).

Responding to a hypothetical by the ALJ, the VE testified that a person capable of at least medium work, who should not work as part of a team in the workplace, works best alone and fairly independently (*i.e.,* does not have to rely on someone else for tasks to be done), with only occasional public contact, and considering Dillenbach's age, education and prior work experience, would be able to perform janitorial work (medium, unskilled), housekeeper (light, unskilled) and small products assembler (light, unskilled).  Tr. 875-76.  However, a person with these limitations who occasionally experiences marked deficits in attention and concentration cannot sustain employment in these occupations.  Tr. 876.  Nor could a person sustain employment in these occupations when experiencing occasional marked deficits in his or her ability to interact and work with a supervisor.  Tr. 877.  On the other hand, a person with these limitations who occasionally experienced marked deficits in socialization in the workplace could sustain employment in these occupations because these are fairly independent jobs.  Tr. 876-77.

The VE clarified that under social security regulations, "occasional" means up to one-third of the work day.  Tr. 879.  When asked whether a person with marked deficit in attention and concentration occurring unpredictably every few weeks for a few hours at a time, the VE testified that such a condition could potentially impact the person's ability to do a job, but that it is difficult to answer "yes" or "no" since "employers respond to employees in various different ways" and the value of an employee depends on the overall production and ability of the worker. *Id*.  A person with "poor interpersonal skills, unrealistic expectations, intense mood swings, needs to be the center of attention, can be inappropriate in sexual behavior or presentation of self, dramatization theatrical," would have difficulty keeping a job.  Tr. 880.  Likewise, a person

35 - FINDINGS AND RECOMMENDATION

who does fairly well for two to three weeks and then decompensates, starts falling apart, getting angry, demanding for a day or two at a time, would have difficulty in maintaining a job and could not maintain the job if he or she "went to work for day and [was] not productive."  Tr. 881-82.  A marked limitation in the ability to respond appropriately to changes in a routine work setting would affect a person 's ability to sustain work.  *Id*.  In the VE's vocabulary, "difficulty" means inability to sustain work.  *Id*.  A marked limitation in the ability to get along with co-workers and peers without distracting them or exhibiting behavioral extremes would limit the work setting, including work as a housekeeper and small products assembler, but may be tolerated in a janitorial position, where the job duties are performed fairly independently.  Tr. 883.

The VE admitted to "very limited" experience with transgender people in the workplace and their effect on their coworkers.  Tr. 878-79.

### C.    Analysis

As discussed above, this court has concluded that the ALJ has failed to provide legally sufficient reasons for rejecting the opinions of Dr. Wahl (as to Dillenbach's GAF), Dr. Stuckey and Jardine, as well as the testimony by Dillenbach.  Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where the ALJ has failed to provide legally sufficient reasons for rejecting such evidence and no outstanding issues must be resolved before a determination of disability can be made if the evidence is credited.  *Harman,* 211 F3d at 1178, citing *Smolen*, 80 F3d at 1292.  The issue then is whether crediting the opinions of Dr. Wahl and Dr. Stuckey, and the limitations identified by Jardine and Dillenbach, coupled with the VE testimony, would result in a determination of disability.

Dillenbach relies on VE testimony that a person who experiences marked limitations in attention and concentration cannot sustain employment in the occupations identified by the VE (janitor, housekeeper or small products assembler). However, none of the examining physicians found marked limitations in Dillenbach's attention and concentration. Dr. Wahl opined that Dillenbach had no limitations in her concentration, persistence and pace. Tr. 270. Dr. Stuckey assessed no significant cognitive impairment, no limitations in understanding, remembering and carrying out short, simple instructions, and in understanding and remembering detailed instructions, and only slight limitations in carrying out detailed instructions and in the ability to make judgments on simple work-related decisions. Tr. 547.

In the alternative, Dillenbach relies on VE testimony that a person who experiences marked deficits in her ability to interact and work with a supervisor cannot sustain employment in the occupations identified by the VE. However, in 2000, Dr. Wahl opined that Dillenbach was markedly limited in her social functioning, in particular her ability to interact appropriately with the general public and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, but only *moderately* limited in the ability to work in coordination with or proximity to others without being distracted by them and to accept instructions and respond appropriately to criticism from supervisors. Tr. 270, 273. Dr. Stuckey identified only moderate restrictions in interacting appropriately with supervisors, as well as coworkers and the public. Tr. 548.

The VE also testified that a person who "does fairly well" in the workplace for two to three weeks and then decompensates, starts falling apart and getting angry for a day or two at a time, would be unable to sustain work. Tr. 882. Decompensation is the "appearance or exacerbation of a mental disorder due to failure of defense mechanisms." STEDMAN'S MEDICAL

DICTIONARY (27th ed. 2000). Dr. Wahl assessed Dillenbach as "often" experiencing episodes of decompensation in the workplace. Tr. 270-71.

The record contains various incidents where Dillenbach was observed falling apart and getting angry. As early as 1995, Dillenbach's coworkers complained that they had to walk on eggshells around her because she tended to be volatile and misperceive events, "systematically alienated the staff," had confrontations with nearly every employee and "used her anger and hostility to control people." Tr. 173-74. Also in 1995, Dillenbach accused Dr. Heck of taking advantage of her and deceiving her about the nature of the psychological evaluation. Tr. 189. In August 2000, Dillenbach was kicked out of her housing for an altercation with a volunteer driver. Tr. 259-60. During one therapy session in February 2001, Dillenbach was "intensely angry and frustrated," and "vented for much of the hour" at the therapist's punctuality and intervention, feeling she should not have to clarify her experiences. Tr. 356. In May 2003, Dillenbach was very angry with herself for being late, angry with Jardine for double booking and because she believed that starting the following month she would no longer be in counseling and would be cut off her psychiatric medication. Tr. 740-41. In June 2003, one of Dillenbach's instructors wrote a letter referring to some "borderline" comments that Dillenbach had made which made the instructor uncomfortable. Tr. 501. She also referenced another incident where Dillenbach overreacted to being caught accessing pornography websites from the school computer as if it was a matter of life and death. Tr. 502, 818. In September 2003, the instructor was worried whether Dillenbach would be able to achieve a medical office/billing position because most people who work in an office come to expect certain behaviors from their coworkers, and Dillenbach "tends to find ways to rub people the wrong way occasionally." Tr. 493. In December 2003, Dillenbach was upset and angry with her therapist for wanting to

38 - FINDINGS AND RECOMMENDATION

update the mental health assessment.  Tr. 721.  In May 2004, Dillenbach experienced "intense anger and self-loathing" when realizing she forgot to bring a letter she wanted to discuss in the counseling session.  Tr. 712.  In July 2004, Mashek and another vocational counselor talked to Dillenbach about her tendency to respond to stress in an aggressive, angry manner.  Tr. 458, 818. On December 29, 2004, Dillenbach described an incident in AA meeting where she "expressed her anger passive aggressively" and felt ashamed when her group was upset with her behavior. Tr. 694.

This evidence is consistent with Dr. Wahl's opinion that Dillenbach would "often" experience episodes of deterioration in work and work-like settings, "more likely if she were forced to pursue her prior work activity."  Tr. 271.  The evidence is also consistent with Jardine's opinion that Dillenbach tends to decompensate in stressful situations.  Tr. 539-40.  Also, Dr. Hart testified that during the times someone is "screaming or yelling on the job, confronting others, acting inappropriately, doing bizarre social behavior," his or her GAF is "[p]robably in the 40s." Tr. 865.

Moreover, Drs. Wahl, Clarkson and Stuckey all diagnosed Dillenbach with dissociative identity disorder, which "reflects a failure to integrate various aspects of identity, memory, and consciousness."  DSM IV, p. 526.  "Each personality state may be experienced as it has a distinct personal history, self image, and identity, including a separate name," and "[a]ggressive or hostile identities may at times interrupt activities or place the others in uncomfortable situations."  *Id*.  Dissociation could result in episodes of decompensation depending on the identity of the personality that emerges, which, in Dillenbach's case, could be the male aggressor Thomas, who is less and less functional and was described by Mashek as a male aggressor. Dissociation would most likely also have a negative impact on work productivity.  Even Dr. Hart

39 - FINDINGS AND RECOMMENDATION

testified that "an individual can have personality problems and dissociate as a result of severe trauma that's very consistent with the history whether or not there's a presence of multiple personality." Tr. 852. Such severe trauma could be Dillenbach's sexual abuse as a teen or the process of gender change. Dr. Clarkson confirmed that another mental health provider was a witness to a dissociation episode. Tr. 672.

This court need not return the case to the ALJ to make a new RFC determination. In light of the VE's testimony, combined with the record as a whole, the ALJ would have to find Dillenbach disabled if the opinions of Dr. Wahl, Dr. Stuckey and Jardine were credited as true. Dillenbach's testimony, which should also be credited, is consistent with those opinions. Moreover, the Appeals Council already remanded the case to the ALJ once for errors in his first opinion. Returning it again to the ALJ would cause further delays, and there is no basis on which the ALJ, after crediting the evidence of the episodes of decompensation and dissociation, could conclude that Dillenbach could perform a full-time job. The record reflects that Dillenbach has made a genuine effort to return to the workplace, but has been and will continue to be unsuccessful due to her impairments. Therefore, a remand for further administrative proceedings serves no useful purpose.

## RECOMMENDATION

For these reasons, the Commissioner's decision should be reversed and remanded pursuant to sentence four of 42 USC § 405(g) for the calculation and award of benefits.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due by **April 16, 2007.**  If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

40 - FINDINGS AND RECOMMENDATION

///

///

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 30th day of March, 2007.

/s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge